# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL NO. 3:06CV492-MU

| | |
|---|---|
| DEBORAH B. ANTHONY,<br>    Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social<br>Security Administration,<br>    Defendant. | **MEMORANDUM AND RECOMMENDATION** |

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Summary Judgment" (document #10) and "Memorandum in Support ... " (document #11), both filed September 7, 2007; and the Defendant's "Motion For Summary Judgment" (document #12) and "Memorandum in Support of the Commissioner's Decision" (document # 13), both filed November 2, 2007. This case has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned will respectfully recommend that Plaintiff's Motion for Summary Judgment be denied; that Defendant's Motion for Summary Judgment be granted; and that the Commissioner's decision be affirmed.

## I. PROCEDURAL HISTORY

On April 9, 1993, the Plaintiff filed an application for a period of disability and Social Security disability benefits ("DIB"), alleging she was unable to work as of March 2, 1993 following a stroke. On June 28, 1993, the Plaintiff's claim was allowed at the initial level.

On February 13, 1998, however, and following an ongoing disability review, the Plaintiff was notified that her benefits would cease because the disability review showed that Plaintiff's health had improved to the point that she was able to return to work.

The Plaintiff's request for reconsideration was denied, and a hearing was held on April 22, 1999 before an Administrative Law Judge ("ALJ"). In a decision dated August 10, 1999, the ALJ denied Plaintiff's claim, and by notice dated November 29, 2001, the Appeals Council denied her request for further administrative review.

The Plaintiff subsequently sought timely review in this Court. See Anthony v. Barnhardt, NCWD File No. 3:02CV37-MCK. On April 8, 2004, the District Judge to whom that case was assigned, the Honorable H. Brent McKnight, remanded the Plaintiff's claim, concluding that the ALJ's evaluation of the Plaintiff's residual functional capacity ("RFC") was not supported by substantial evidence. Specifically, Judge McKnight held that in formulating the Plaintiff's RFC, the ALJ improperly rejected the opinion of Dr. Ram Prakash and improperly relied upon the examination and opinion of Dr. Tyler Freeman.[1] See "Order" at 9-10 (NCWD File No. 3:02CV37-MCK, document #12). Judge McKnight concluded that the ALJ erred by disregarding Dr. Prakash's opinion (that the Plaintiff continues to be disabled) solely on the fact that the Plaintiff had only a "one-time visit" with Dr. Prakash. Noting that Dr. Freeman also saw the Plaintiff only once in arriving at his contrary opinion that the Plaintiff is no longer disabled, Judge McKnight remanded the case "to allow the ALJ to properly consider th[ose] opinions." Id. at 10.

---

[1] Judge McKnight also noted that he was unpersuaded by Plaintiff's remaining assertions of error. He concluded that substantial evidence supported the ALJ's determination that Plaintiff did not meet or equal any Listing because she did not meet the required prongs of any listing; that substantial evidence supported the ALJ's finding of medical improvement; and that substantial evidence supported the ALJ's reliance on vocational expert testimony despite the expert's alleged failure to identify sources of job descriptions given.

On remand, the Appeals Council vacated the ALJ's August 10, 1999 decision, and remanded the matter for further proceedings by the ALJ. Prior to the second hearing, the Plaintiff was evaluated consultatively by Lori Schneider, M.D., a neurologist, whose objective findings and opinions are discussed below.

On December 16, 2005, the ALJ conducted the second hearing, at which the Plaintiff appeared along with her counsel. On January 10, 2006, the ALJ again issued an unfavorable decision. On November 6, 2006, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.

The Plaintiff filed the present action on December 6, 2006, and the parties' cross-motions for summary judgment are ripe for disposition.

## II. FACTUAL BACKGROUND

The Plaintiff testified at both hearings. At the first hearing, the Plaintiff testified that she was born on May 13, 1951 and was 47 years-old; that she lived with her husband and teenage son; that she had graduated high school and completed a Certified Nurse Assistant ("CNA") program but had not taken the licensing test; that she had become disabled in 1993 after suffering a stroke; and that she had prior work experience as a retail worker, a daycare worker, a day camp counselor, and a cleaner.

Concerning her medical condition, the Plaintiff testified that she was unable to work due to double vision in her right eye, neck and back pain, swelling in her left leg, and lack of sensation on her left side; that her condition had not improved since her stroke; that she had a cane at her home that she sometimes used to assist in walking; that she suffered high blood pressure which was

controlled by medication; that she also had pain in her hands secondary to carpal tunnel syndrome she had suffered in the 1980s; that she had two sets of prescription eyeglasses, one for reading and one other activities, but did not always wear them; and that she did not attend physical therapy or pursue any other treatment of her allegedly disabling conditions.

The Plaintiff testified concerning her daily activities that she could bathe and dress herself; that she had a driver's license and drove; that she did no housework or household errands; that she was unable to perform household chores due to "strains on [her] back"; that she attended church; that she walked for exercise; and that she could lift twenty pounds.

At the second hearing, the Plaintiff testified that her condition and activities were essentially unchanged since the first hearing and denied that there had been any improvement in her condition in the interim.

At the second hearing, the Plaintiff's neighbor, Classie Worthy, testified that she had known the Plaintiff since 1976; that she had a "brief" recollection of the stroke the Plaintiff suffered in 1993; that since 1998, she had seen the Plaintiff two or three times per week; that initially after the stroke, the Plaintiff could not walk, but then her condition had improved; and that the Plaintiff's vision in her right eye was the major limiting factor on the Plaintiff's activities. In response to the ALJ's question as to whether the Plaintiff "can walk," Ms. Worthy agreed that she could.

A Vocational Expert ("VE") testified at the second hearing, classifying the Plaintiff's prior work experience as light and semiskilled (daycare work, clerical work) and medium and skilled (day camp counselor).

The ALJ then presented the VE with the following hypothetical:

assuming ... [the Plaintiff's] exertional impairments would permit sedentary and light

work on a sustained basis, with certain significant non-exertional impairments ... rule out any ... jobs requiring frequent or repetitive as compared to occasional climbing, balancing, exposure to unprotected heights, or hazardous machinery or [risks of] falling ... significant exposure to extremes of temperature, particularly cold ... fine visual acuity of a type that you might run into in inspecting, for instance ... limiting [the Plaintiff] to essentially gross visual acuity ... depth perception would be precluded.... If we were to place those restrictions on a female of 42 to 53, with the high school plus educational level we've previously discussed, and the prior work to the extent it might be relevant, are there jobs such a person could do?

The VE testified in response that with those limitations, the Plaintiff would be able to work as an information clerk (sedentary and semiskilled), library page (light and unskilled), survey worker (light and unskilled), and telephone answering service attendant (sedentary and unskilled), all of which were drawn from the Dictionary of Occupational Titles; and that 15,891 of these jobs were available in North Carolina.

Upon further questioning from the ALJ and the Plaintiff's counsel, the VE testified that the Plaintiff would be able to perform those jobs even if her non-exertional limitations prevented her from performing more than simple routine repetitive tasks and if she suffered pain sufficient to prevent her from performing skilled concentration.

On December 31, 1997, John E. Thomas, M.D., a medical expert for North Carolina Disability Determination Services ("NCDDS"), completed a Physical Residual Functional Capacity Assessment, concluding that the Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, could sit, stand and/or walk six hours in an eight hour workday, and had unlimited ability to push or pull, provided that the Plaintiff never climb ladders, ropes or scaffolds or climb ramps or stairs more than occasionally, and avoid frequent stooping, kneeling, crouching and crawling. In making this analysis, Dr. Thomas reviewed the Plaintiff's medical records, noting that a recent eye examination was "normal in all respects"; that Plaintiff's eye doctor recorded that the Plaintiff

continued to drive and had walked "briskly" through his office; and that a recent physical examination had shown, and Plaintiff had admitted to her doctor, that she had no neuromotor symptoms, sensory deficits, or muscular atrophy. Dr. Thomas concluded that the Plaintiff was capable of performing medium work. Later on December 31, 1997, a second Agency medical expert, whose name is illegible in the record, reviewed and concurred in Dr. Thomas' evaluation.

On a "Reconsideration Report for Disability Cessation," dated March 18, 1998, the Plaintiff stated that she could bathe and dress herself; that she could walk; that she cooked "a little," but did not do "much cleaning up"; that she drove a car; and attended church weekly.

On November 18, 1998, the Plaintiff met with an Agency interviewer to orally report and discuss her medical history and daily activities. The interviewer noted, among other things, that the Plaintiff stated that she took over-the-counter medications for pain, folded clothes, and served on her church's Missionary Board, which required her to make telephone calls to the church's sick or "shut-in" members. The interviewer did not notice that the Plaintiff had any difficulty breathing, seeing, speaking, hearing, sitting, walking, standing, using her hands and arms, writing, reading, comprehending, responding, concentrating, remembering, or relating to people. To the contrary, the interviewer noted that despite complaints of difficulty walking and using her left arm, the Plaintiff "was able to walk through the office without difficulty, with no outward signs of pain" and that the Plaintiff "moved her left arm normally and walked normally." (Tr. 92.)

The parties have not assigned error to the ALJ's recitation of the Plaintiff's medical records. Moreover, the Court has carefully reviewed the Plaintiff's medical records and finds that the ALJ's recitation is accurate. Accordingly, the undersigned adopts the ALJ's statement of the medical record, as follows:

The medical records show that [Plaintiff] was hospitalized in March 1993 after she had an cerebrovascular accident with a right thalamic hemorrhage. Following her hospital discharge, the claimant experienced double vision and reduced strength and sensation on the left side of her body (Exhibits 16F, 17F). When she returned to her family doctor in April 1993, she reported that she was having headaches off and on and that she was wearing an eye patch because she had double vision without it (Exhibit 15F). An ophthalmologic exam performed in May 1993 revealed that her vision had improved since her stroke but she had a visual field abnormality and her eyes reacted poorly to light changes (Exhibit 18F). Dr. Eugene Benjamin, a consultative neurologist, examined the claimant in June 1993 and found eye movement abnormalities, decreased sensation and reduced strength of 4/5 in her left arm and leg, markedly decreased rapid movements in the fingers of her left hand, and a left hemiparetic[2] pattern with balance problems. Dr. Benjamin concluded that the claimant could not lift, carry, or handle objects with her left hand and would benefit from an assistive device for balancing when standing and walking (Exhibit 19F).

Additional medical evidence was obtained in connection with the continuing disability review. The records of the Carolina Medical Center clinic show that the claimant has asthma, allergic rhinitis, and hypertension which are well controlled with medication, and that most of her visits have been for treatment of recurrent sinusitis and menstrual problems. She reported a past history of a stroke but has had little treatment for any residual effects (Exhibit 20). Dr. Tyler Freeman, a consultative physician, examined the claimant in December 1997 and found that she had a full range of motion in her back and all joints with no atrophy, swelling, tenderness, or sensory deficits. Dr. Freeman wrote that the neurological exam performed in June 1993 had revealed a hemiparetic pattern to her gait but that her gait was normal at the current examination (Exhibit 21). The claimant also underwent a consultative psychological evaluation conducted by John Warnken, M.S. Mr. Warnken observed that the claimant did not have any problems with her posture, motor activity or gait, but that her eyes did not track together. Psychological tests showed that she was functioning in the average range of memory but the intellectually deficient range of intelligence. However, Mr. Warnken concluded that her test results were affected by her vision problems (Exhibit 22). Dr. Norman Sawyer, a consultative ophthalmologist, examined the claimant in December 1997 and observed that she was able to walk briskly through the unfamiliar surroundings of the office with no apparent visual impairment. The claimant reported that she had a valid driver's license and continued to drive. Dr. Sawyer concluded that her eyes were normal, that her best corrected visual acuity was 20/25 on the right and 20/20 on the left, and that his review of the chart indicated a vast improvement in her neuropathy since 1993 (Exhibit 23).

---

[2]Hemiparetic pertains to hemiparesis, a partial paralysis affecting one side of the body. <u>Dorland's Illustrated Medical Dictionary</u> 800 (30th ed. 2003).

Dr. R[am] Prakash completed a functional capacity questionnaire in March 1999, a few weeks before the claimant's first hearing. Dr. Prakash wrote that the claimant had multiple functional limitations, including the capacity to sit, stand, or walk for less than two hours in a work day. However, he did not describe any functional tests which he had performed in order to determine the limitations imposed, and the only clinical findings he listed were strabismus in her right eye, scars on her wrists, and reduced grip strength of 4/5 (Exhibit 27).

Additional medical evidence was obtained in connection with the court remand order. Dr. Lori Schneider, a consultative neurologist, examined the claimant in July 2005. The claimant reported balance problems in that she occasionally stumbled, weakness in her hands, status post carpal tunnel surgery, and double vision and blurry vision in her right eye. She also reported that she was independent in her activities of daily living and was able to drive short distances during the day. Dr. Schneider wrote that the claimant displayed giveway weakness but, with encouragement, the claimant's grip strength and strength in all extremities was normal at 5/5, and she was able to perform dexterous movements with both hands. Dr. Schneider observed that the claimant had a slow and cautious gait with dragging in both feet and that she had tenderness in her wrists and shoulders. However, Dr. Schneider wrote that interpretation of her motor strength, coordination, and gait was very limited as result of her poor effort (Exhibit 37).

The updated clinic records show that the claimant received routine care. Her asthma was assessed as well controlled and asymptomatic and her blood pressure was adequately controlled with changes in her medication. The claimant was treated for high cholesterol, allergic rhinitis, and vaginal bleeding. Although her records showed a past history of a stroke, she was not treated for any problems associated with this (Exhibit 40).

(Tr. 265-66.)

The ALJ considered the above-recited evidence and determined that as of February 1998, the Plaintiff was no longer "disabled" for Social Security purposes.

## III. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The district court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir.

1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. DISCUSSION OF CLAIM

The question before the ALJ was whether the Plaintiff's disability had ended by February 1998.[3] The ALJ considered the above-recited evidence and found after the hearing that the Plaintiff had not engaged in substantial gainful activity at any time relevant to his decision; that none of the Plaintiff's impairments, alone or in concert, met or medically equaled any impairment in the Listing of Impairments found in 20 C.F.R. § 404, subpart P, Regulation 4, Appendix 1; that the medical evidence established that there had been improvement in the Plaintiff's medical impairments since 1993 related to her ability to work; that Plaintiff continued to suffer from "severe" residual effects of a cerebrovascular accident; that Plaintiff could no longer perform her past relevant work; and that since February 1998, the Plaintiff retained the residual functional capacity to perform light[4] and

---

[3]Under the Social Security Act, 42 U.S.C. § 301, et seq., the term "disability" is defined as an:
   inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

[4]"Light" work is defined in 20 C.F.R. § 404.1567(b) as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there

sedentary work with no significant exposure to extremes of temperature, especially cold, no more than occasional climbing, balancing, or exposure to unprotected heights or hazardous machinery, no frequent fine visual acuity such as is required in inspection jobs, and limited to gross visual acuity with no requirement for depth perception and simple, routine, unskilled or semi-skilled tasks.

After noting correctly that Medical-Vocational Rules 202.14 and 202.21 would require a finding of "not disabled" for a person of comparable age and education who could perform a "full range" of light work, the ALJ then shifted the burden to the Secretary to show the existence of other jobs in the national economy which the Plaintiff could perform. The VE's testimony, stated above and based on a hypothetical that factored in the limitations discussed above, provided substantial evidence that there were a significant number of jobs in the national economy that the Plaintiff could perform, and, therefore, that the Plaintiff was no longer disabled.[5]

Concerning Dr. Prakash's written report, which the ALJ had been ordered to evaluate more thoroughly on remand, the ALJ stated:

> The only clinical findings listed [in Dr. Prakash's report] are strabismus in [Plaintiff's] right eye, scars on both wrists, and grip strength of 4/5. Dr. Prakash did not give any basis for limitations such as the need to elevate her legs, to use an assistive device, or to have frequent absences. When asked to explain his conclusion that the claimant was capable of only low stress jobs, he wrote that her blood pressure could go up and cause a new stroke. Yet the treatment records show that her blood pressure is well controlled with medication. When asked to describe other limitations, he wrote that she had the usual problems status post stroke and depression (Exhibit 27). Yet the treatment records show that she had no residual limitations other than very mild left sided weakness and vision problems (Exhibit 20). Dr. Prakash's assessment is not supported by either his own examination or the other medical evidence in the record.

---

are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

[5] The Plaintiff mistakenly contends that the VE failed to identify his source for the jobs he listed. As stated above, however, the VE clearly identified each job as it appears in the Dictionary of Occupational Titles.

Accordingly, I have given little weight to his opinion.

(Tr. 268.)

Concerning Dr. Freeman's opinion, the ALJ stated:

I have also reassessed the opinion of Dr. Freeman. As discussed above, Dr. Freeman found that the claimant had a full range of motion with no sensory deficits. Dr. Freeman added that the claimant had displayed a peculiar cogwheel muscle weakness in her left upper and lower extremities but that this was definitely effort related and exaggerated (Exhibit 21). The District Court suggested that little weight should be given to Dr. Freeman's opinion. It is unclear why the District Court states that the tests performed by Dr. Freeman are not relevant to the residual functional capacity evaluation. Clinical findings of a full range of motion show that the claimant is able to perform postural activities such as bending while findings that the claimant no longer has gait problems support the residual functional capacity findings of the State agency medical consultants regarding the claimant's capacity for standing and walking for a full work day. The Court rejected Dr. Freeman's opinion regarding the claimant's malingering because Dr. Freeman is not a neurologist, his opinion was inconsistent with Dr. Prakash's opinion, and there was no other evidence of malingering. However, the recent consultative examination by Dr. Schneider, a neurologist, supports Dr. Freeman's opinion. Dr. Schneider concluded that the claimant had shown a poor effort throughout the exam and that she seemed to be exaggerating. Dr. Schneider was asked to complete a medical source statement but did not do so (Exhibit 37). The claimant's allegations to Dr. Freeman and Dr. Schneider, and her behavior at these examinations, is inconsistent with her subjective complaints in the treatment records (Exhibits 20, 21, 37, 40).

(Tr. 269.)

On appeal from the ALJ's second decision, the Plaintiff initially assigns error to the ALJ's conclusion that she no longer met the requirements for Listing 11.04B, "central nervous system vascular accident," but instead had experienced medical improvement. Listing 11.04B requires evidence of "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station" occurring more than three months post-vascular accident. 20 C.F.R. § 404, subpart P, Regulation 4, Appendix 1; Listing 11.04B. Incorporated in Listing 11.04, by reference, is Section 11.00C, which requires consideration

12

of the severity of the disturbance of motor function. The undersigned finds that substantial evidence supports the ALJ's determination that by early 1998, the Plaintiff's condition had improved to the point that she no longer met Listing 11.04B, that is, she no longer had a significant and persistent disturbance of motor function in two extremities.

Indeed, far from showing that she continued to be disabled, the records of the physicians who saw the Plaintiff during the relevant time period show that by 1998 the Plaintiff was no longer partially paralyzed on her left side; that she could walk nearly, if not entirely, normally; and that she could use her left arm and hand. By as early as 1996, Dr. Soyode reported that Plaintiff was "without residual deficits" from her 1993 stroke except for weak muscles in the left eye. In December 1997, Dr. Freeman found normal range of motion and deep tendon reflexes; no sensory deficits, muscle wasting, instability, or ankylosis; and reported that Plaintiff ambulated normally and was able to get on and off the exam table without assistance. Similarly Dr. Sawyer reported that Plaintiff "had no visual impairment whatever as she walked briskly through the unfamiliar surroundings of the office. She continues to drive a car with a valid license. She admits and appears to have no neuromotor CVA sequlae. Review of chart indicates vast improvement in neuropathy since '93." (Tr. 210.) Also, Plaintiff admitted to Dr. Warnken in December 1997 that she did laundry and some cooking. Subsequently, Dr. Godwin found that Plaintiff's activity was unrestricted and later noted that she suffered only from "very mild left side weakness."

The consultative examination conducted by Dr. Schneider in 2005 also supports the ALJ's conclusion that the Plaintiff had experienced significant improvement. In addition to making findings consistent with those of the physicians discussed above, Dr. Schneider concluded that the Plaintiff showed poor effort throughout the exam and that she seemed to be exaggerating her

13

symptoms.

Finally on this point, the ALJ properly evaluated the opinions of Dr. Prakash and Dr. Freeman, neither of whom treated the Plaintiff, but examined her consultatively.[6] As discussed above, Dr. Freeman's opinion that the Plaintiff had no disabling deficiencies in range of motion, strength, or walking was consistent with the contemporaneous records of the Plaintiff's treating physicians and Dr. Schneider's subsequent evaluation. Moreover, as the ALJ discussed in detail in his second decision, quoted above, Dr. Prakash's opinion was not supported by his own limited findings, much less those of other physicians.

Having concluded properly that the Plaintiff no longer met Listing 11.04B, the ALJ proceeded to formulate the Plaintiff's residual functional capacity and to determine whether there were a significant number of jobs in the national economy that the Plaintiff could preform notwithstanding her ongoing exertional and non-exertional limitations.

The Social Security Regulations define "residual functional capacity" as "what [a claimant] can still do despite h[er] limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

The ALJ's opinion clearly indicates that he did, in fact, consider whether Plaintiff's alleged

---

[6]The Commissioner's regulations establish that an examining physician's opinion is only entitled to a level of weight proportionate to the amount of relevant evidence, particularly medical signs and laboratory findings, provided in support of the opinion; and the degree of the opinion's consistency with the record. 20 C.F.R. §§ 404.1526(d)(3)-(4). Stated differently, an examining physician's opinion that is not supported by objective evidence or is inconsistent with other substantial evidence should be accorded significantly less weight. Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

impairments limited her ability to work. Agency medical experts determined that the Plaintiff had the residual functional capacity for medium work – could occasionally lift 50 pounds and frequently lift 25 pounds; that she could sit, stand, and/or walk 6 hours in an 8-hour workday; and that her ability to push and/or pull was unlimited – with the only non-exertional limitations of never climbing ladders, ropes or scaffolds or climbing ramps or stairs more than occasionally, and avoiding frequent stooping, kneeling, crouching and crawling.

The ALJ found the Plaintiff able to work as of February 1998, however, based upon a residual functional capacity only for light or sedentary work with the same non-exertional limits placed by the Agency experts <u>plus</u> limitations related to her lack of fine visual acuity, depth perception, and ability to sustain skilled concentration.

In addition to the recitation and discussion above, the medical record is also clear that Plaintiff's complaints of muscle weakness and pain were treated extremely conservatively and that she rarely if ever sought any pain reliever stronger than over-the-counter medicines and never pursued formal physical therapy. To the contrary, the Plaintiff admitted at the first hearing that she was able to exercise on her own by walking. On this point, <u>see</u> <u>Mickles v. Shalala</u>, 29 F.3d 918, 921 (4th Cir. 1994) (evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel); <u>and</u> <u>Gross v. Heckler</u>, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"), <u>citing</u> <u>Purdham v. Celebrezze</u>, 349 F.2d 828, 830 (4th Cir. 1965).

The record is also clear that the Plaintiff engaged in significant daily life activities during the subject period, such as bathing and dressing herself, performing some household chores, driving, attending church, and making telephone calls to check on other church members. On the relevance

of an ability to engage in substantial daily activities to a disability claim, see, e.g., Mickles, 29 F.3d at 921 (plaintiff performed "wide range of house work," which supported finding of non-disability); and Gross, 785 F.2d at 1166 (evidence that plaintiff washed dishes and generally performed household chores supported finding of non-disability).

The ALJ also properly applied the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain and, in this case, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was not fully credible.

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), citing 20 C.F.R. § 416.929(b); and § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work." Id. at 595, citing 20 C.F.R. § 416.929(c)(1); and § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Craig, 76 F.3d at 595 (citations omitted).

The record contains evidence of Plaintiff's stroke and its after effects – which could be

expected to produce some of the pain claimed by Plaintiff – and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in Craig. However, the ALJ also correctly evaluated the "intensity and persistence of her pain, and the extent to which it affects her ability to work," and found Plaintiff's subjective description of her limitations not credible.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." Mickles, 29 F.3d at 921, citing Hunter v. Sullivan, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain was not as severe as he asserted). In this case, the record before the ALJ clearly established an inconsistency between the Plaintiff's claims of inability to work and her objective ability to carry on a moderate level of daily activities, that is, to drive, do some housework, walk for exercise, and remain active in her church, as well as the objective medical record discussed above.

Although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Moreover, the facts noted by the ALJ clearly support the ultimate conclusion that by February 1998, the Plaintiff suffered from, but was not disabled from working, by her combination of impairments.

Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." Mickles, 29 F.3d at 923, citing Simmons v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's

determination that the Plaintiff was no longer disabled.

## V. RECOMMENDATIONS

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that Plaintiff's "Motion for Summary Judgment" (document #10) be **DENIED;** that Defendant's "Motion for Summary Judgment" (document #12) be **GRANTED**; and that the Commissioner's determination be **AFFIRMED.**

## VI. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder, 889 F.2d at 1365. Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Wells, 109 F.3d at 201; Page, 337 F.3d at 416 n.3; Thomas v. Arn, 474 U.S. 140, 147 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties; and to the Honorable Graham C. Mullen.

**SO RECOMMENDED AND ORDERED**.

Signed: November 7, 2007

Carl Horn, III
United States Magistrate Judge